UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
TIG INSURANCE COMPANY, as successor to
RANGER INSURANCE COMPANY, and
ASSOCIATED ELECTRIC AND GAS
INSURANCE SERVICES LIMITED,

                      Plaintiffs,

        -against-

SWISS REINSURANCE AMERICA
CORPORATION F/K/A NORTH AMERICAN
REINSURANCE CORPORATION,

                      Defendant.
----------------------------------------------------------------X

**OPINION AND ORDER**

21 Civ. 8975 (NSR)(JCM)

Plaintiffs TIG Insurance Company ("TIG"), as successor to Ranger Insurance Company ("Ranger"), and Associated Electric and Gas Insurance Services Limited ("AEGIS") (collectively, "Plaintiffs") filed suit against Swiss Reinsurance America Corporation, previously known as North American Reinsurance Corporation ("Defendant"), alleging that Defendant failed to pay part of a confidential settlement resolving claims under six policies issued by Ranger that were reinsured by AEGIS and, subsequently, by Defendant. (Docket No. 1). Presently before the Court is Defendant's motion for a protective order, (Docket Nos. 40; 41), Plaintiffs' opposition to the motion, (Docket Nos. 45; 46), and Defendant's reply, (Docket No. 50). For the reasons set forth below, Defendant's motion is granted in part and denied in part.

**I.    BACKGROUND[1]**

Ranger is an insurance company that issued six policies to two North Carolina utility companies (Duke Energy and Carolina Power & Light) in 1982 covering potential harm to the

---

[1] The facts set forth herein are taken from the Complaint and the parties' briefs. The Court includes these facts "to provide [] context for the discovery" dispute and the Court makes "[n]o factual findings with respect to the merits of the litigation[.]" *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 440 n.1 (S.D.N.Y. 1995).

environment by certain coal combustion plants. (Docket No. 1 ¶¶ 1, 8).  The six policies issued were initially reinsured[2] by AEGIS "on a 100% basis," (*id.* ¶ 14), until Defendant assumed that liability in or around 1982, (Docket No. 41 at 2-3).[3]  In 2017, Duke Energy filed suit in North Carolina seeking payment from Plaintiffs, among numerous other insurance companies that issued similar policies, for damage incurred at 15 combustion plants covered by the Ranger policies. (Docket No. 1 ¶ 8).  Plaintiffs settled the lawsuit in July 2021 following a decision by the North Carolina Superior Court granting partial summary judgment for Duke Energy on TIG's scope of coverage—potentially exposing them to $375 million in damages ($25 million per plant). (*Id.* ¶ 29); *see also Duke Energy Carolinas, LLC v. AG Ins. SA/NV*, 17-CVS-5594, 2020 WL 3047206, at *1 (N.C. Super. Ct. June 5, 2020).

Following settlement of Duke Energy's claims, AEGIS, as the initial reinsurer of the six policies, remitted payment for the full settlement amount to Duke Energy. (Docket Nos. 41 at 3; 45 at 4).  Shortly thereafter, AEGIS sent Defendant a bill for its alleged share of the settlement due under the six insurance policies. (Docket No. 1 ¶ 41).  Defendant refused to pay arguing, *inter alia*, that: (1) AEGIS was not a party to its reinsurance contracts with TIG, thus AEGIS cannot seek recovery on TIG's behalf since TIG's potential liability was satisfied when AEGIS paid the settlement to Duke Energy; (2) the agreement AEGIS relied on in seeking reimbursement from Defendant was not for these six policies and had expired; and (3) the

---

[2] Reinsurance is the process by which "all or part of one insurer's risk" is assumed "by a second insurer, who accepts the risk in exchange for a percentage of the original premium." *Reinsurance*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[3] The evolution of Defendant's assumption of the risk associated with the six policies issued by Ranger is muddled and the parties do not agree on whether Defendant was in privity with AEGIS, or only TIG. (*Compare* Docket No. 41 at 3 *with* Docket No. 45 at 4).  However, for purposes of this motion, the Court need not wade into this factual dispute since all that is relevant to the instant motion is that Ranger issued six policies that were reinsured in some form by Defendant and that, after AEGIS paid the entire amount of the settlement, it sought payment from Defendant, who refused to pay anything.

amount sought was unreasonable and based on unilateral allocation modeling, which Defendant maintains was erroneous. (Docket No. 41 at 3-4). In response to Defendant's refusal to pay, Plaintiffs filed the instant lawsuit on November 2, 2021. (Docket No. 1).

The current dispute concerns whether the Court should grant Defendant a protective order shielding them from producing the following two categories of documents on the grounds that they are protected by the attorney-client privilege: (1) communications and presentations generated by Defendant's "Key Case Committee" that analyzed potential liability on Duke Energy's asserted claims; and (2) documents and communications regarding allocation modeling of Duke Energy's claims across the policies issued by Ranger. The parties submitted letter motions relating to this dispute on May 8, 2023, and May 10, 2023. (Docket Nos. 32; 36). Upon review of the letters, the Court ordered full briefing on the issue on May 24, 2023. (Docket No. 37). The parties subsequently briefed the dispute and Defendant submitted the 197 contested documents for *in camera* review. (Docket Nos. 41; 45; 50).[4]

## II.  LEGAL STANDARDS

### A.  Protective Orders

Rule 26(c) of the Federal Rules of Civil Procedure provides that a court may issue "an order to protect a party or person [from whom discovery is sought] from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). The district court has "broad discretion . . . to decide when a protective order is appropriate and what

---

[4] For the first time since this dispute was raised to the Court, Plaintiffs claim in their opposition brief that Defendant deliberately omitted certain categories of documents from its privilege log, or previously logged the documents but subsequently removed them without explanation. (Docket No. 45 at 11-13). However, Defendant has provided specific examples of where the allegedly missing documents appear on the log and has explained why certain documents were removed. (Docket No. 50 at 6-8). The Court accepts Defendant's explanation for the discrepancy, but to the extent Plaintiffs still believe documents are missing, the parties shall meet and confer to try and resolve the issue. If a dispute remains, Plaintiffs may thereafter raise it to the Court in accordance with the procedures set forth in Docket No. 31.

degree of protection is required." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984); *Dove v. Atl. Capital Corp.*, 963 F.2d 15, 20 (2d Cir. 1992) ("[T]he grant or denial of a protective order lies within the sound discretion of the district court.").

"The party seeking a protective order bears the burden of establishing that good cause for the order exists." *Duling v. Gristede's Operating Corp.*, 266 F.R.D. 66, 71 (S.D.N.Y. Mar. 30, 2010). "Good cause is established by 'demonstrating a particular need for protection.'" *Id.* (quoting *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986)). "Ordinarily, good cause exists 'when a party shows that disclosure will result in a clearly defined, specific and serious injury.'" *In re Terrorist Attacks on Sept. 11, 2001*, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006) (quoting *Shingara v. Skiles*, 420 F.3d 301, 306 (3d Cir. 2005)). "Although the burden is on the movant to establish good cause for the entry of a protective order, the court ultimately weighs the interests of both sides in fashioning an order." *Duling*, 266 F.R.D. at 71.

**B.    Attorney-Client Privilege[5]**

The attorney-client privilege protects "communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011). "For the privilege to apply, the communication itself must be 'primarily or predominantly of a legal character.'" *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 428 (S.D.N.Y.

---

[5] Pursuant to Rule 501 of the Federal Rules of Evidence, "state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501. Since the only claim in this case is for breach of contract, "New York law governs privilege." *Caruso v. Grace*, No. 11 Civ. 2353 (SAS)(KNF), 2012 WL 2497274, at *2 (S.D.N.Y. June 27, 2012). However, because "New York law regarding the attorney-client privilege . . . substantially follows federal law" the Court will cite to both federal and state law interchangeably. *Subramanian v. Lupin Inc.*, No. 17-CV-5040 (RAK)(HP), 2019 WL 1771556, at *2 n.3 (S.D.N.Y. Apr. 23, 2019) (citation omitted).

2013) (quoting *Rossi v. Blue Cross & Blue Shield of Greater N.Y.*, 542 N.Y.S.2d 508, 511 (1989)); *In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007) ("Fundamentally, legal advice involves the interpretation and application of legal principles to guide future conduct or to assess past conduct."). "It is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship." *In re Grand Jury Subpoena Dtd. Jan. 4, 1984*, 750 F.2d 223, 224 (2d Cir. 1984); *In re Bonnano*, 344 F.2d 830, 833 (2d Cir. 1965) ("That burden is not, of course, discharged by mere conclusory or ipse dixit assertions[.]").

"Application of the attorney-client privilege to the corporate context poses 'special problems.'" *Complex Sys., Inc. v. ABN AMRO Bank N.V.*, 279 F.R.D. 140, 150 (S.D.N.Y. 2011) (quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985)). "In-house counsel often fulfill the dual role of legal advisor and business consultant." *MSF Holding, Ltd. v. Fiduciary Tr. Co. Int'l*, No. 03 Civ. 1818 (PKL)(JCF), 2005 WL 3338510, at *1 (S.D.N.Y. Dec. 7, 2005). "The court therefore must proceed cautiously, recognizing that the application of the privilege 'risks creating an intolerably large zone of sanctuary since many corporations continuously consult attorneys.'" *Ovesen v. Mitsubishi Heavy Indus. of Am. Inc.*, No. 04 Civ. 2849 (JGK)(FM), 2009 WL 195853, at *3 (S.D.N.Y. Jan. 23, 2009) (quoting *First Chicago Int'l v. United Exch. Co. Ltd.*, 125 F.R.D. 55, 57 (S.D.N.Y. 1989)). "In cases involving corporations and in-house counsel, courts have maintained a stricter standard for determining whether to protect confidential information through the attorney-client privilege." *Bank Brussells Lambert v. Credit Lyonnais (Suisse), S.A.*, 220 F. Supp. 2d 283, 286 (S.D.N.Y. 2002) ("There is also a concern that in-house attorneys are more likely to mix legal and business functions."). A communication is not

protected simply because it is shared with an attorney, rather it must be "primarily" or "predominantly" of a legal nature. *Egiazaryan*, 290 F.R.D. at 428.

### III. DISCUSSION

#### A. Relevance

"The burden of demonstrating relevance is on the party seeking discovery . . . [and] [o]nce relevance has been shown, it is up to the responding party to justify curtailing discovery." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 284 F.R.D. 132, 135 (S.D.N.Y. 2012) (quoting *Trilegiant Corp. v. Sitel Corp.*, 275 F.R.D. 428, 431 (S.D.N.Y. 2011)). The Court has "broad discretion in determining relevance for discovery purposes," *Michael Kors, L.L.C. v. Su Yan Ye*, No. 1:18-CV-2684 (KHP), 2019 WL 1517552, at *2 (S.D.N.Y. Apr. 8, 2019), and determines relevance "in light of the claims and defenses asserted by the parties," *In re Bairnco Corp. Sec. Litig.*, 148 F.R.D. 91, 96 (S.D.N.Y. 1993).

Here, neither side disputes that the withheld documents are relevant to the claims and defenses asserted. Therefore, the documents are discoverable, and the Court must determine whether they are shielded from disclosure by the attorney-client privilege.[6]

#### B. The Key Case Committee

Defendant seeks to protect 122 communications and presentations from disclosure because they were prepared by or for its Key Case Committee. According to Defendant, the Key Case Committee "is a high-level committee . . . [that] advise[s] on legal strategies, reserve positions and other key issues raised by large and difficult claims." (Docket No. 41 at 7).

---

[6] In its initial letter motion regarding the disputed documents, Defendant claimed that the "categories of documents are protected by the attorney-client privilege and work product doctrine." Docket No. 32 at 1. However, Defendant failed to submit argument on the applicability of the work-product doctrine to the disputed documents in its motion papers. (Docket Nos. 41; 50). Moreover, the privilege logs submitted to the Court in connection with this dispute, (Docket Nos. 32-2; 32-3; 41-3; 41-4), only claim attorney-client privilege. Thus, this Opinion and Order only addresses whether the disputed documents are protected under the attorney-client privilege.

Defendant avers that the committee provides both "legal and strategic advice," (*id.* at 5), and that the individuals involved are "not conducting a routine claim investigation," (*id.*).

Defendant argues that the attorney-client privilege applies to Key Case Committee communications and presentations because: (1) the committee includes a senior in-house lawyer "at every Key Case Committee meeting . . . to provide legal advice," (Docket No. 41 at 8), so there is a presumption of privilege; (2) the committee's work does not constitute "routine claim handling" that typically would be discoverable because it "discusses only large claims that raise important legal issues[]" and only a small percentage of all claims reach the committee, (Docket No. 41 at 8); and (3) the Key Case Committee materials were kept confidential and "[c]laim handlers are told that their communications with the committee are privileged[,]" (Docket No. 41 at 8).  In response, Plaintiffs argue that Key Case Committee documents were primarily generated for business purposes, and that this was confirmed by testimony from two non-lawyer witnesses who prepared and reviewed updates for the committee. (Docket No. 45 at 9).  According to Plaintiffs, the Key Case Committee is part of Defendant's routine claim handling process, providing analysis on exposure coverage issues; as a result, materials it generates are not privileged. (*Id.*)

The Court finds that Defendant's arguments do not warrant a blanket application of the attorney-client privilege to the disputed documents.  First, the presence of counsel at a meeting is not determinative, especially where the minutes from those meetings are largely non-substantive.  S*ee, e.g.*, Key Case Log[7] No. 51; *see also McDonald v. Hempstead Union Free Sch. Dist.*, No. 18-CV-5658 (DRH)(SIL), 2021 WL 11688030, at *4 (E.D.N.Y. Mar. 24, 2021) ("the mere presence of counsel during a discussion, even one allegedly protected by the attorney-client

---

[7] The "Key Case Log" refers to a privilege log filed by Defendant on June 14, 2023, describing withheld Key Case Committee documents. (Docket No. 41-3).

privilege, does not automatically preclude disclosure of the discussion's underlying facts") (citation omitted).  Second, the attorney-client privilege is not triggered by the importance or infrequency of a committee's work.  Third, while it is true that the Key Case Committee's communications and presentations were intended to be kept confidential, they are not "primarily or predominantly of a legal character." *Egiazaryan*, 290 F.R.D. at 428.  While some of the communications and presentations prepared by the Key Case Committee contain legal advice or requests for legal advice, (*e.g.*, Key Case Log Nos. 55, 56, 65, 66, 70), other parts of the documents contain business evaluations.  Thus, these documents are "not protected simply because legal considerations are involved," *Complex Sys., Inc*, 279 F.R.D. at 150 (internal quotations omitted).  Furthermore, although a party's intent to keep communications and documents confidential is one element of the attorney-client privilege, it is not dispositive. *See Mejia*, 655 F.3d  at 132 ("The party asserting the privilege . . . bears the burden of establishing its essential elements.").

The Court will now address the two categories of Key Case Committee materials submitted for *in-camera* review.

**1.      Key Case Committee Communications**

Of the roughly 53 Key Case Committee communications submitted, the overwhelming majority are non-substantive e-mails between non-lawyers attaching drafts of Key Case Committee presentations.  In addition, nearly all of the substantive e-mails are between non-lawyers discussing potential financial exposure from TIG's settlement of the Duke Energy policies, timelines of regulatory developments, and high-level minutes from Key Case Committee meetings. (*See, e.g.*, Key Case Log Nos. 24, 51).  These communications are not subject to the attorney-client privilege and should be produced. *See Tower 570 Co. LP v.*

*Affiliated FM Ins. Co.*, 20-CV-0799 (JMF), 2021 WL 1222438, at *6 (S.D.N.Y. Apr. 1, 2021) (ordering production of "communications between non-lawyers [made] for business purposes"); *OneBeacon Ins. Co. v. Forman Int'l, Ltd.*, No. 04 Civ. 2271 (RWS), 2006 WL 3771010, at *6 (S.D.N.Y. Dec. 15, 2006) (holding that "documents prepared in the ordinary course of [an] insurer's business (which by its nature, involves claim investigation and analysis) are not protected from discovery") (internal quotations omitted) (collecting cases).

As for the Key Case Committee communications submitted that have lawyers somewhere on the e-mail chain or that relay advice provided by lawyers, the portions containing or referencing legal advice are extricable from the non-legal portions. Therefore, these documents must be produced with the legal advice redacted. For example, Key Case Log Nos. 59 and 60 include general public information regarding the Duke Energy lawsuit under the heading "Underlying litigation" that should be produced, even though the section following this contains legal advice from outside counsel that may be redacted. "[I]f non-privileged communications are mixed in with the privileged communications, then the documents must be redacted and produced. Defendants cannot withhold an entire document if only one part of it is privileged." *Jenkins v. Miller*, Case No. 2:12-cv-184 (WKS), 2021 WL 1115928, at *3 (D. Vt. Mar. 24, 2021); *see also Flaherty v. Giambra*, No. 02-CV-0243E (SR), 2004 WL 816906, at *2 (W.D.N.Y. Jan. 27, 2004) (ordering defendants to "redact[] and produce[] [a document] inasmuch as it contains facts that are separable from privileged material"). Thus, with this guidance in mind, Defendant must carefully re-review the mixed communications it withheld and produce all of them, with only the portions reflecting actual legal advice redacted.

**2.     Key Case Committee Presentations**

The same principles apply to the presentations prepared by the Key Case Committee. Only discrete portions of these presentations reflect legal advice from counsel. These sections are easily separable from the rest of the content in the presentations, which were predominately prepared by non-lawyer insurance professionals providing analysis on issues such as: (1) the underlying Duke Energy litigation in North Carolina; (2) defenses raised by insurers sued by Duke Energy; and (3) the potential financial impact of Duke Energy's litigation and settlement on Defendant. Certainly, some portions of the Key Case Committee presentations are privileged. For instance, legal analysis provided by outside counsel and subsequently added to draft presentations is privileged and may be redacted, (*see e.g.*, Key Case Log Nos. 56 (text in blue font provided by outside counsel may be redacted), 79 (pages 8-9 and 15 of slide deck may be redacted)), but the balance must be produced. It is not enough to simply assert that the materials include "[d]iscussions of legal issues," (Docket No. 41 at 11), to shield them entirely from disclosure. Rather, the material sought to be protected must actually reflect legal advice or analysis provided by counsel. *See Saran v. Chelsea GCA Realty P'ship, L.P.*, 104 N.Y.S.3d 698, 700 (2d Dep't 2019).

Accordingly, the Court finds that the Key Case Committee communications and presentations are privileged only in part and Defendant is directed to redact and produce the non-privileged portions in accordance with the guidance set forth herein.

**C.     Allocation Modeling Documents**

The second category of documents Defendant seeks to withhold is allocation documents and communications "that concern [Defendant's] modeling of its potential exposure to the environmental claims at issue in the underlying coverage litigation." (Docket No. 41 at 10).

Defendant claims that these documents are privileged because modeling exposure involves "predict[ing] how the court handling the underlying coverage litigation might allocate the overall loss across Duke's entire insurance program." (*Id.* at 10-11).  As a result, Defendant argues that this requires "legal judgment." (*Id.* at 10).  Plaintiffs counter that "allocation modeling of this type is a standard practice to help an insurer evaluate a claim," (Docket No. 45 at 10), and that deposition testimony confirms that it is business analysis done by non-lawyers to determine how liability should be apportioned, (Docket No. 46-2 at 24:1-24:4).  The Court agrees.

Allocation modeling is the process by which an insurer forecasts the amount it may owe an insured who submitted a claim for damage incurred over a period of time that was covered by multiple successive insurance policies. *Intergovernmental Risk Management Agency*, https://www.irmi.com/term/insurance-definitions/allocation (last visited Sept. 18, 2023).  For example, assume Mary purchases a waterfront home on the beach.  Knowing the risk associated with owning property so close to a large body of water, she purchases flood insurance from multiple insurance companies at various points in time and for varying durations.  After a few rough winters that erode the property, she submits claims to the insurance companies she previously purchased policies from to recover for the damage.  Because the damage occurred over an extended period, and because Mary had insurance policies from different companies at various points, it is not immediately clear how much each insurer will be required to pay.  In response to this uncertainty, insurers undertake allocation modeling to forecast their potential liability.[8]

---

[8] This example is how allocation modeling works at its most simplistic level.  However, it is typically far more complex and involves dozens of insurers and reinsurers that assume portions of the liability initially incurred by other insurers.

Here, TIG allocated 57% of a settlement made with Duke Energy in the North Carolina litigation to Defendant as reinsurer of six policies issued by Ranger. (Docket No. 1 at ¶ 28). Plaintiffs argue this level of allocation was based on the North Carolina court's determination that TIG was liable for the full $25 million per plant coverage issued to Duke Energy. (*Id.*). Defendant counters that this allocation determination is unreasonable because: (1) the amount paid to Duke Energy was a lump sum and not per policy, and (2) the determination was based on Plaintiffs' allegedly erroneous allocation modeling. (Docket No. 41 at 3-4).  Therefore, Plaintiffs seek discovery of communications and documents concerning the allocation modeling Defendant performed on the Ranger policies "to respond to Swiss Re's assertion and affirmative defense that the allocation used for the billing is not objectively reasonable." (Docket No. 36 at 2) (internal quotation omitted).  However, Defendant claims these documents are protected from disclosure under the attorney-client privilege.

There is a dearth of caselaw on whether the attorney-client privilege applies to allocation modeling.  However, after careful review of the allocation documents *in camera* and the submissions of the parties, the Court finds that the allocation modeling documents are business records that are not protected by the attorney-client privilege. *See Fox News Network, LLC v. U.S. Dep't of Treasury*, 911 F. Supp. 2d 261, 271 (S.D.N.Y. 2012) ("The attorney-client privilege protects only legal advice, not economic, business, or policy advice.").  This is consistent with evidence in the record and an analogous federal case that examined whether privilege applies to allocation modeling. *See Certain London Mkt. Co. Reinsurers v. Lamorak Ins. Co.*, Civil Action No. 18-10534 (NMG), 2020 WL 6048345, at *5 (D. Mass. Oct. 13, 2020) ("On balance, the court finds that . . . the preparation of the Allocation was ordinary course insurance claims adjustment, and not legal advice or work-product privileged from discovery")

(internal quotations omitted); *see also* (Docket No. 50-2 at 50:22-51:3) ("The purpose of the modeling is designed to be able to ascertain a best estimate of exposure based on a number of variables that might come out, based on a number of different contracts with different possible language that would involve that"); (Docket No. 41-6 at 42:7-10) ("The focus was in looking at how the damages or responsibility for the damages would be assigned with respect to the policies of interest to [Defendant]").

The court in *Lamorak* grappled with a similar privilege dispute. The defendant in *Lamorak* was an insurance company that issued policies to an insured that were subsequently reinsured by the plaintiff. *Lamorak*, 2020 WL 6048345, at *1. The insured sued the defendant and multiple other insurance companies. *Id.* Ultimately, the insured prevailed. *See generally Olin Corporation v. INS Company of N.A., et. al.*, No. 84-cv-01968 (JSR), Docket Nos. 2194; 2376 (S.D.N.Y.) Thereafter, the defendant billed the plaintiff-reinsurer to recover under a "simultaneous payments clause" in the reinsurance contract between the parties. *Lamorak*, 2020 WL 6048345, at *2. The plaintiff-reinsurer argued then that the defendant's allocation of funds did not follow the allocation of liability in the litigation between the insured and the insurers and was unreasonable. *Id.* at *2. During discovery, the plaintiff-reinsurer sought production of the defendant's allocation documents to prove their theory and the defendant claimed privilege over the documents. After reviewing the documents *in camera*, the court held that the documents were not privileged since they "relate[d] to the allocation of the settlement amount for purpose of reinsurance billing," and that any allocation work done by attorneys was "akin to that of a consultant rather than attorney representing a client." *Id.* at *4.[9]

---

[9] Defendant's attempt to distinguish *Lamorak*, (Docket No. 50 at 5-6), is unpersuasive. The fact that the parties in this case are on opposite sides of the parties' positions in *Lamorak* does not change the Court's determination that the content of the allocation documents involves business and not legal advice. Nor is it true that Defendant's allocation documents "have nothing to do with AEGIS's bill." *Id.* at 6. Defendant has argued here that it does not

- 13 -

In the instant case, the allocation documents Defendant submitted for *in camera* review are primarily for the purpose of modeling potential loss scenarios that could result from the North Carolina court's decision regarding Plaintiffs' liability to Duke Energy. Where a document or e-mail is generated for the purpose of obtaining or providing business advice, even if attorneys are involved, the attorney-client privilege does not apply. *Kleeberg v. Eber*, 16-CV-9517 (LAK)(KHP), 2019 WL 2085412, at *6 (S.D.N.Y. May 13, 2019) ("If the communication's predominant purpose was to seek or convey business advice, then it is not privileged") (citing *Spectrum Sys. Int'l Corp. v. Chem. Bank*, 575 N.Y.S.2d 809, 815 (1991)); *see also Clarke v. J.P. Morgan Chase & Co.*, No. 08 Civ. 02400 (CM)(DF), 2009 WL 970940, at *7 (S.D.N.Y. Apr. 10, 2009) ("If, regardless of the prospect of litigation, the document would have been prepared anyway, in the ordinary course of business or in essentially similar form, it is not entitled to work product protection") (internal quotation omitted). Defendant's contention that the allocation modeling documents are privileged because they were generated with input from inside and outside counsel does not alter the purpose of the documents—to determine financial liability. Even the few communications that involve outside counsel (*see, e.g.*, Allocation Log[10] No. 14) are primarily for the purpose of analyzing claim exposure and, therefore, are not privileged. *Lamorak*, 2020 WL 6048345, at *5 ("The court accepts [plaintiff's] argument that, in a typical reinsurance case, the preparation of the reinsurance allocation is a claims function that a business person undertakes to support a reinsurance billing, and so materials pertaining to that process are not privileged.")

---

have to pay Plaintiffs because their allocation of loss was unreasonable. Plaintiffs are entitled to test this argument and determine whether Defendant itself had forecasted a similar loss through its allocation modeling.

[10] The "Allocation Log" refers to a privilege log filed by Defendant on June 14, 2023 describing withheld allocation modeling documents. (Docket No. 41-4).

Accordingly, the allocation modeling documents are not privileged and must be produced in full.[11]

## IV.  CONCLUSION

For the reasons set forth herein, Defendant's motion for a protective order is granted in part and denied in part. Defendant must: (1) produce the Key Case Committee communications and presentations with the portions reflecting legal advice redacted; and (2) produce, in full, the allocation modelling documents by October 10, 2023. The Clerk of the Court is respectfully requested to terminate the pending motion (Docket No. 40).

Dated:   September 18, 2023
         White Plains, New York

**SO ORDERED:**

_____
JUDITH C. McCARTHY
United States Magistrate Judge

---

[11] The Court will not, at this time, order Plaintiffs to produce its allocation documents as Defendant requests, (Docket Nos. 41 at 12 and 50 at 6 n.1), since the issue has not been properly raised in the instant dispute. However, the reasoning in this Opinion and Order applies with equal weight to allocation documents withheld by Plaintiffs for the same reasons asserted by Defendant. Thus, Plaintiffs should reevaluate their positions in light of this decision.