UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TIG INSURANCE COMPANY, as successor to RANGER INSURANCE COMPANY, and ASSOCIATED ELECTRIC AND GAS INSURANCE SERVICES LIMITED,

Plaintiffs,

-against-

SWISS REINSURANCE AMERICA CORPORATION F/K/A NORTH AMERICAN REINSURANCE CORPORATION,

Defendant.

21 CV 8975 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Plaintiffs TIG Insurance Company ("TIG"), as successor by merger to Ranger Insurance Company ("Ranger"), and Associated Electric and Gas Insurance Services Limited ("AEGIS") brought this action against Defendant Swiss Reinsurance America Corporation ("SRA"), formerly known as North American Reinsurance Corporation ("NARe"), alleging breach of six facultative reinsurance certificates issued by NARe to Ranger between 1982 and 1984 (the "NARe/Ranger Certificates").

Following the completion of discovery, the parties cross-moved for summary judgment (ECF Nos. 83, 87.) The Court denied the motions, finding "there exists a genuine dispute of material fact as to whether SRA is in breach of the Certificates and as to the proper interpretation of the Certificate's scope of anticipated liability." (ECF No. 120, "Opinion and Order," at 13.) Thereafter, the Court scheduled a bench trial.

The Court conducted a nine-day bench trial from February 2, 2026, through February 17, 2026. Each trial witness's direct testimony was received in the form of a sworn affidavit or

declaration; cross-examination was conducted live, either in court or by Microsoft Teams, throughout trial. Plaintiffs called five witnesses: AEGIS's outside counsel Alan Rutkin; Riverstone's Michael Kuehn, Rickey Glover, and Christopher LeGros; and AEGIS's Vice President and Counsel, Helen Lynch. Defendant, in turn, called nine current and former Swiss Re, AEGIS, and Riverstone witnesses, including Alexander Schneeberger, Martin Tang, Kevin Coleman, Lisa Simon, Fred Gindraux, Stephen Byrne, Steven Antunes, Bryce Larrabee, and Jeffrey Schupack. The parties filed their respective post-trial submissions on March 30, 2026. (*See* ECF Nos. 144–47.)

Based on the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, the Court finds that Defendant SRA breached the NARe/Ranger Certificates.

**LEGAL STANDARD**

"Federal Rule of Civil Procedure 52(a) provides, in relevant part, that a court conducting a bench trial 'must find the facts specifically and state its conclusions of law separately.'" *Pinovi v. FDD Enterprises, Inc.*, No. 13-CV-2800 (GBD) (KNF), 2015 WL 4126872, at *1 (S.D.N.Y. July 8, 2015) (quoting Fed. R. Civ. P. 52(a)(1)). As the finder of fact in a bench trial, the Court "'is entitled to make credibility findings about the witnesses and testimony and to draw reasonable inferences from the evidence presented' in reaching its factual findings." *Greater Chautauqua Fed. Credit Union v. Quattrone*, No. 1:22-CV-02753 (MKV), 2025 WL 2771567, at *1 (S.D.N.Y. Sept. 26, 2025) (quoting *CH Acquisitions 2, LLC v. Aquila Aviation L.P.*, No. 16-CV-2030 (RJS), 2018 WL 2081860, at *1 (S.D.N.Y. Mar. 30, 2018)).

"A factfinder's ability to draw reasonable inferences from the evidence is well established." *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 101–02 (2d Cir. 2012); *see also Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (recognizing the court's obligation as trier of fact to determine "which of the permissible competing inferences it will draw"); *Jackson*

*v. Virginia*, 443 U.S. 307, 319 (1979) ("[It is] the responsibility of the trier of fact fairly to . . . draw reasonable inferences from basic facts to ultimate facts."). "An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *Siewe v. Gonzales*, 480 F.3d 160, 168–69 (2d Cir. 2007) (internal punctuation and citations omitted) (finding a single fact in the record "viewed in the light of common sense and ordinary experience" can serve as foundation for an "inferential leap").

Having reviewed the parties' submissions, the sworn affidavits and declarations, the admitted exhibits, the trial transcript, and the live testimony presented at trial, the Court sets forth the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### I. The Parties

AEGIS is a Bermuda-domiciled mutual insurance company that began issuing policies in or around 1975. (Pls.' Proposed Findings of Fact and Conclusions of Law ("Pls.' FFCL") ¶ 1, ECF No. 145; Def.'s Proposed Findings of Fact and Conclusions of Law ("Def.'s FFCL") ¶ 4, ECF No. 147; ECF No. 1 ("Compl.") ¶ 3; Trial Tr. 1082:11-20 (Byrne).) It is owned by its member-policyholders, all of whom operate in the energy and energy-related industries. (Pl. Ex. 5 (Lynch Aff. ¶¶ 3-5); Def. Ex. D-5185 (Larrabee Dec. 2019 Aff. ¶ 12).)

TIG is the successor by merger to Ranger Insurance Company and is a subsidiary of Fairfax Financial Holdings Group. (Compl. ¶ 2; Def.'s FFCL ¶ 5.) TIG's claims are managed by Riverstone Claims Management LLC ("Riverstone"), a third-party administrator. (Trial Tr. 295:25-296:18 (Kuehn).) SRA, formerly NARe, is a New York-licensed reinsurer based in Armonk, New York. (Compl. ¶ 4; ECF No. 20 ("Answer") ¶ 4.) SRA is a subsidiary of Swiss Re

Ltd., which at all relevant times was also the ultimate parent of European General Reinsurance Company of Zurich ("EG"). (Def.'s FFCL ¶ 7.)

**II. The NARe/Ranger Certificates**

The contracts in suit are six facultative reinsurance certificates issued by NARe to Ranger covering policy years October 31, 1982 through October 31, 1985. Def. Exs. D-5007, D-5008, D-5010, D-5009, D-5011, D-5012. Each certificate corresponds to a single underlying excess liability policy issued in Ranger's name. Three were written for Duke Power Company and three for Carolina Power & Light Company. Pl. Exs. 7, 8; Def. Exs. D-5016, D-5017, D-5015, D-5014.

Each certificate states: "NARe does hereby reinsure Ranger . . . (herein called the COMPANY) with respect to the COMPANY's policy hereinafter described." Def. Exs. D-5007, D-5008, D-5010, D-5009, D-5011, D-5012. Each further provides: "This Certificate is an Agreement of Reinsurance under which the Reinsurer indemnifies the Company with respect to its insurance liability assumed under the policy set forth on the front of this Certificate subject to the following terms and conditions." *Id.* The 1982-1983 certificates cover $15 million excess of $10 million; the 1983-1984 and 1984-1985 certificates cover $25 million each. Def. Exs. D-5007, D-5008, D-5010, D-5009, D-5011, D-5012. Aggregate ceded limits across the six certificates total $130 million.

**III. The Underlying Ranger-Fronted Policies**

The underlying policies (the "Ranger-Fronted Policies") bore Ranger's name on the declaration page but were written on AEGIS-form policy wording. Trial Tr. 57:8-25 (Rutkin); Def. Ex. D-5179 (Byrne April 2018 Aff. ¶ 8). AEGIS underwrote the policies using its own rating models, calculated the premiums, prepared the policy forms, and forwarded them to Ranger for ministerial signature. Def. Ex. D-5179 ¶¶ 7-8; Trial Tr. 1062:16-1075:18 (Byrne). AEGIS received

all risk premium; Ranger was paid only a fronting commission. Def. Ex. D-5056 (EG-AEGIS Telex Jan. 23, 1984) ("AEGIS/RANGER…NO PREMIUMS PAYABLE…AEGIS TO PAY FRONTING COMMISSION TO RANGER."); Trial Tr. 1071:24-1072:11 (Byrne); Trial Tr. 1162:24-1163:4 (Larrabee).

AEGIS used Ranger as a fronting carrier because, at the time of issuance, AEGIS was not admitted in North Carolina and was not a U.S. taxpayer, which would have subjected its U.S. insureds to federal excise tax. Trial Tr. 1086:4-7 (Byrne); Def. Ex. D-5347 (Byrne Duke Dep. 35:7-36:16). Once AEGIS obtained surplus lines authorization in North Carolina and a favorable IRS ruling, the fronting arrangement ended; beginning October 31, 1985, AEGIS issued policies directly. Def. Ex. D-5328; Trial Tr. 1086:4-1087:11 (Byrne).

In 1982 negotiations memorialized in contemporaneous telexes, Ranger conditioned its agreement to front upon "100 pct reinsurance thru AEGIS/Swiss Re as arranged by AEGIS/EBASCO" and demanded a "cut-through to reinsurors and reinsurance certificate as soon as possible." Def. Ex. D-5148 (Whitcomb-AEGIS Fax May 4, 1982). Ranger sought a cut-through endorsement directly from EG. Def. Ex. D-5024 (Ranger-EG Telex July 8, 1982). EG declined, consistent with its general practice. Def. Ex. D-5025 (EG-Ranger Telex July 12, 1982); Def. Ex. D-5002 (Schneeberger Decl. ¶¶ 32, 35); Def. Ex. D-5019 (EG Memo to File Sept. 24, 1980).

Following EG's refusal, Ranger explained in an August 3, 1982 telex that its concern was both "DUE TO AMOUNT OF LIABILITY INVOLVED" and the "NON-ADMITTED REINSURANCE PROBLEM." Def. Ex. D-5027 (EG-AEGIS Telex Aug. 4, 1982). EG arranged for its New York-licensed affiliate, NARe, to issue facultative certificates directly to Ranger. Def. Exs. D-5033, D-5034, D-5035 (EG-NARe telexes Nov.-Dec. 1982); Def. Ex. D-5004 (Tang Aff. ¶ 30); Def. Ex. D-5002 (Schneeberger Decl. ¶¶ 37-39). Those certificates are the contracts in suit.

**IV. The Three-Layer Reinsurance Structure**

AEGIS issued, through Ranger as fronting carrier, the Ranger-Fronted Policies to Duke. Ranger ceded 100% of its policy liability to NARe under the NARe/Ranger Certificates. Def. Exs. D-5007–D-5012. NARe in turn retroceded 100% of its liability to EG under six retrocessional certificates. Def. Exs. D-5038, D-5039, D-5061, D-5062, D-5073, D-5074. For the 1983 and 1984 policy years, EG further retroceded the first $2.5 million of each risk back to AEGIS. Def. Exs. D-5063, D-5064, D-5070, D-5071.

The structure had two purposes. It gave Ranger reinsurance from a New York-admitted carrier, solving Ranger's "non-admitted reinsurance problem," namely, the inability to take statutory financial-statement credit for reinsurance from a non-admitted Bermuda or Swiss reinsurer. Def. Ex. D-5004 (Tang Aff. ¶¶ 9, 22, 32); Def. Ex. D-5002 (Schneeberger Decl. ¶ 14). It also preserved the underlying economics of the AEGIS-EG treaty relationship by retroceding the first $2.5 million back to AEGIS, mirroring the Automatic Facultative Reinsurance Agreement ("Auto Fac"), which AEGIS and EG were parties to. Def. Ex. D-5018 (Auto Fac, Art. I); Def. Ex. D-5049. NARe was paid no risk premium; like Ranger, it received only a fronting commission. Def. Ex. D-5056 ¶ 3; Trial Tr. 1060:15-21 (Byrne).

**V. Course of Performance, 1982 to 2016**

From inception of the Ranger-Fronted Policies through emergence of the Duke coal ash claims in 2016, AEGIS handled and paid all claims. Pl. Ex. 189 (DeVito Tr. 23:22-24:11); Trial Tr. 58:16-25 (Rutkin); Trial Tr. 1140:6-21 (Antunes); Trial Tr. 1190:1-6 (Schupack); Trial Tr. 1171:4-14 (Larrabee). Ranger never paid a claim. Pl. Ex. 189 (DeVito Tr. 24:23-25:2). The Court finds this testimony credible.

AEGIS resolved several substantial claims involving the Ranger-Fronted Policies, including a $23 million settlement with Duke in 2001 and settlements with CP&L in 2003 and 2007. Def. Ex. D-5166; Def. Ex. D-5167; Def. Ex. D-5079. AEGIS resolved those matters without consulting Ranger. Trial Tr. 1120:17-1126:17; 1140:18-1144:16 (Antunes).

AEGIS also reported the Ranger-Fronted Policies on its quarterly Auto Fac bordereaux to EG. Def. Exs. D-5020-D-5023 (Q4 1981); Def. Exs. D-5150-D-5153 (Q4 1982); Def. Exs. D-5154-D-5157 (Q4 1983); Def. Exs. D-5158-D-5161 (Q4 1984). In 2003, AEGIS commuted the Auto Fac for $45 million. Def. Ex. D-5168; Trial Tr. 1216:20-1220:24 (Schupack).

SRA urges the Court to draw from this course of performance and the Auto Fac commutation the inference that the Ranger-Fronted Policies were reinsured exclusively under the Auto Fac, and that the commutation extinguished any reinsurance recovery available to Ranger. Def.'s FFCL ¶¶ 135-39. For the reasons explained below, the Court does not draw that inference. The Auto Fac and the NARe/Ranger Certificates are separate contracts, and AEGIS's pre-commutation reporting practices do not affect TIG's contractual rights against SRA under certificates issued directly to Ranger.

**VI. The Duke Coal Ash Litigation**

On August 29, 2016, Duke notified AEGIS and TIG of potential liability for environmental damage caused by coal ash at multiple North Carolina power plants. Def. Ex. D-5169; Def. Ex. D-5170. Duke sought coverage under, among other policies, the six Ranger-Fronted Policies. *Id.* AEGIS responded that it had issued the Ranger-Fronted Policies, listing them in its September 26, 2016 letter. Def. Ex. D-5171; Trial Tr. 51:19-52:10 (Rutkin); Trial Tr. 1138:7-11 (Antunes). Duke replied that, "based on your letter we assume that AEGIS, which we understand bears ultimate

financial responsibility for coverage under those policies, will be handling the claim on behalf of those insurers." Def. Ex. D-5172; Trial Tr. 1138:21-1139:1 (Antunes).

In November 2016, AEGIS asked TIG for permission to handle the coal ash claims. Def. Ex. D-5173. TIG was initially reluctant; its concern was that doing so might "impair any right that it had to recovery from either AEGIS or [SRA]." Trial Tr. 360:18-21 (Glover). The Court is persuaded by Mr. Glover's testimony on this point.

**VII. The May 26, 2017 Agreement**

On May 26, 2017, AEGIS and TIG executed a letter agreement in which AEGIS confirmed it would assume control of the defense and settlement of the coal ash claims, and the parties expressly preserved TIG's reinsurance rights against SRA. Def. Ex. D-5093 (May 2017 Agreement).

Paragraph 4 provides that "AEGIS represents and acknowledges that it is responsible for 100% of past and future loss (including any extra contractual loss) and defense costs payable under the Ranger Policies." *Id.* ¶ 4. Paragraph 5 provides that AEGIS "waives any right to collect costs arising out of this claim . . . including litigation costs, from TIG or RiverStone Claims Management, LLC." *Id.* ¶ 5. Paragraph 9 provides that AEGIS will appear in the North Carolina coverage action "in its own capacity" as the "real Party in Interest." *Id.* ¶ 9.

Paragraph 6 provides: "Neither TIG nor AEGIS intend for this agreement to compromise or in any way affect TIG's right to reinsurance pursuant to policies/certificates issued by North American Reinsurance Company (now known as Swiss Re)." *Id.* ¶ 6.

Riverstone's Rickey Glover, who negotiated the May 2017 Agreement on TIG's behalf, testified that Paragraph 6 was inserted at TIG's insistence to "document" that the Agreement did not "change in any way the Certificates issued by Swiss Re," and to "make sure that AEGIS was

aware of those certificates." Trial Tr. 386:22-23 (Glover); *see also* Pl. Ex. 4 (Glover Aff. ¶¶ 30-38). Mr. Glover further testified that he "specifically told Mr. Rutkin and Ms. Lynch about the facultative certificates that had been issued by North American Re" before the Agreement was signed. Trial Tr. 365:11-14 (Glover). The Court credits Mr. Glover's testimony, which is corroborated by the contemporaneous documentary record.

**VIII. SRA's Notice and Reservation of Rights**

SRA was on notice of the Duke Litigation and the potential for a reinsurance claim from at least February 2017. Riverstone's Christopher LeGros contacted SRA's Lisa Simon in early February 2017, identified the NARe/Ranger Certificates by certificate number, and informed SRA that AEGIS sought to assume claims control. Def. Exs. D-5080, D-5081 (LeGros-Simon emails Feb. 1, 2017); Def. Ex. D-5003 (Simon Aff. ¶¶ 12-13).

Ms. Simon located the certificates in SRA's microfiche records, confirmed their terms, and on March 16, 2017 met with AEGIS's outside counsel, George Kappus, at SRA's Armonk offices. Def. Ex. D-5003 (Simon Aff. ¶¶ 30, 45-53); Def. Ex. D-5044 (microfiche records); Def. Ex. D-5090 (Kappus File Memo Mar. 21, 2017). At that meeting, Ms. Simon, Kevin Coleman, and SRA in-house counsel Larry Licitra confirmed to Mr. Kappus that NARe had issued reinsurance certificates to Ranger. Def. Ex. D-5000 (Coleman Aff. ¶ 24); Def. Ex. D-5003 (Simon Aff. ¶ 26); Def. Ex. D-5090. Mr. Kappus's contemporaneous file memorandum records the same. Def. Ex. D-5090.

On March 27, 2017, Ms. Simon wrote to Mr. LeGros: "We do not object to Riverstone's providing copies of the certificates noted above to AEGIS, nor do we object to Riverstone's decision to permit AEGIS to assume control of this claim for and on behalf of Ranger. However we fully reserve all of our rights under the certificates and applicable law." Def. Ex. D-5092. SRA

repeated reservations of rights through 2020 and 2021. Def. Exs. D-5105, D-5108, D-5109, D-5110; Pl. Exs. 45, 48; Def. Ex. D-5122.

Throughout 2020 and 2021, SRA monitored the Duke Litigation through outside counsel Robert Bates of the Bates Carey firm. Def. Ex. D-5003 (Simon Aff. ¶ 43). After AEGIS waived a conflict, the parties operated under a common interest agreement. Pl. Exs. 24, 25, 26. AEGIS and SRA exchanged regular updates on the litigation. Def. Exs. D-5106, D-5109, D-5110, D-5112, D-5114.

The Court does not treat SRA's monitoring of the Duke Litigation, standing alone, as a wholesale waiver of all coverage defenses. SRA's reservation of rights preserved its ability to contest coverage, allocation, and payment under the NARe/Ranger Certificates. But those reservations do not defeat liability where, as here, the certificates apply and the allocation was reasonable and made in good faith.

**IX. The Settlement and the Reinsurance Bill**

AEGIS settled the Duke Litigation effective August 3, 2021 for $185 million. Compl. Ex. 3; Def. Ex. D-5124. TIG was a signatory; Bryce Larrabee executed the agreement on TIG's behalf. Def. Ex. D-5124 at SRA00100202; Trial Tr. 1178:3-8 (Larrabee). The settlement resolved Duke's claims against both AEGIS and TIG, including under the six Ranger-Fronted Policies. Def. Ex. D-5124 at SRA00100183-85. AEGIS funded the entire settlement. Trial Tr. 435:25-436:7 (Lynch); Trial Tr. 1265:14-18 (Schupack).

On August 10, 2021, AEGIS's outside counsel wrote to TIG's outside counsel confirming that, "in consideration of AEGIS's advancement of both the defense costs and settlement amounts under the Ranger Policies," Riverstone, on behalf of TIG/Ranger, authorized AEGIS to bill SRA under the certificates and "assign[ed] to AEGIS all amounts paid thereunder in connection with

the defense and settlement of the Duke Ash Claim." Def. Ex. D-5377. Riverstone's Michael Kuehn, who was at TIG when the bill was submitted and remains there, testified that he understood the assignment was effected. Trial Tr. 345:20-348:6 (Kuehn). TIG joined this action as a co-plaintiff. (*See generally* Compl.)

On October 1, 2021, AEGIS, as TIG's assignee, presented SRA with a reinsurance bill totaling $114,272,539, representing 57% of AEGIS's settlement payment plus a proportionate share of defense costs. Compl. Ex. 3. The 57% figure was developed by AEGIS in consultation with reinsurance allocation consultant Judson Jaffe between July and November 2020. Def. Exs. D-5356, D-5190, D-5116, D-5192, D-5117, D-5194, D-5195. The methodology assumed (i) that the 1984 Ranger-Fronted Policies would be exhausted on an "all sums" basis, consistent with the North Carolina court's June 2020 decision in the underlying coverage action, Pl. Ex. 23 (Order dated June 5, 2020, from the North Carolina Gen. Court of Justice, Superior Court); and (ii) that pre-1984 policies would be allocated on a pro rata basis, Def. Ex. D-5196 (Lopatto Letter Nov. 30, 2020).

SRA posed questions on October 15 and 29, 2021; AEGIS answered some of them on October 18. Def. Exs. D-5129, D-5130. SRA ultimately refused payment. Def. Ex. D-5131.This lawsuit followed.

**X. Witness Credibility**

The Court generally credits Plaintiffs' witnesses (Alan Rutkin, Michael Kuehn, Rickey Glover, Christopher LeGros, and Helen Lynch) where their testimony was based on firsthand knowledge, remained consistent on cross-examination, and was corroborated by the documentary record. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985).

**A. Rickey Glover**

Mr. Glover's testimony regarding the negotiation and purpose of the May 2017 Agreement was important to the Court's finding that TIG preserved its reinsurance rights. Trial Tr. 360:18–386:23 (Glover); Pl. Ex. 4 (Glover Aff. ¶¶ 30–38). Mr. Glover personally negotiated Paragraph 6 at TIG's insistence and testified that his purpose was to ensure that the May 2017 Agreement could not be read, by AEGIS or anyone else, to extinguish TIG's rights under the NARe/Ranger Certificates. Trial Tr. 370:5–22; 386:22–23 (Glover). That testimony is credible and corroborated by the contemporaneous record, including the draft exchange the night before signing, Glover's May 23, 2017 letter setting out TIG's concerns, and the Agreement text itself. Def. Ex. D-5093 ¶¶ 4, 6.

**B. Alan Rutkin**

Mr. Rutkin's testimony regarding the development of the allocation methodology and his communications with TIG counsel was likewise credible. Trial Tr. 57:8–25, 92:23–100:11, 158:12–197:8 (Rutkin). As AEGIS's outside litigation counsel throughout the Duke Litigation, Mr. Rutkin had direct, first-hand knowledge of the allocation modeling process and the instructions he gave consultant Jud Jaffe. His account of those interactions was detailed and consistent with the admitted Jaffe email chain. Def. Exs. D-5190, D-5192, D-5194, D-5195. The Court credits his testimony on the allocation process. Although SRA challenges the allocation methodology he directed, those challenges are addressed in Section VII and do not undermine Mr. Rutkin's credibility as a witness.

**C. Helen Lynch**

Ms. Lynch testified candidly about AEGIS's evolving understanding of the certificates and the May 2017 Agreement. Trial Tr. 432:16–482:6 (Lynch). Her candor was particularly notable

because portions of her testimony were unfavorable to AEGIS's litigation position. She acknowledged that AEGIS did not fully appreciate the implications of the NARe/Ranger Certificates at the time the May 2017 Agreement was signed, and confirmed that AEGIS has never sought to retract the Agreement. Trial Tr. 435:1–24 (Lynch). The Court credits those acknowledgments.

**D. Christopher LeGros and Michael Kuehn**

The Court found Mr. LeGros and Mr. Kuehn forthright in describing Riverstone's communications with both AEGIS and SRA, including their February 2017 outreach to Lisa Simon. Trial Tr. 295:25–348:6 (Kuehn); *see* Def. Exs. D-5080, D-5081, D-5083. Mr. LeGros identified the NARe/Ranger Certificates by certificate number in his very first communication to SRA in February 2017, which shows that he knew of the certificates and that he was candid with SRA from the outset. Def. Ex. D-5080. Mr. Kuehn, who remained at TIG through trial, testified consistently about the August 2021 assignment and confirmed he understood it was effected. Trial Tr. 345:20–348:6 (Kuehn). Neither witness had a direct financial stake in the litigation outcome; both are claims administrators serving institutional principals.

**E. SRA's Percipient Witnesses**

The Court credits the testimony of Lisa Simon, Kevin Coleman, and Fred Gindraux as to the historical events they personally observed in 2017 and after, including their internal investigation, the March 16, 2017 Kappus Meeting, and SRA's subsequent communications with Plaintiffs. Def. Ex. D-5003 (Simon Aff.); Def. Ex. D-5000 (Coleman Aff.); Def. Ex. D-5001 (Gindraux Aff.). Their characterizations of legal significance (including their views on whether the certificates cover only credit risk, or whether SRA's reservation of rights foreclosed all

coverage obligations) are legal conclusions offered by interested witnesses, not lay factual testimony, and the Court treats them as argument.

**F. The Schneeberger and Tang Testimony**

SRA relies in significant part on the testimony of two former Swiss Re Zurich underwriters, Alexander Schneeberger and Martin Tang. SRA offers their testimony to establish that NARe and Ranger intended the NARe/Ranger Certificates to reinsure only Ranger's net retained "fronting risk" rather than the gross policy liability shown on the face of the certificates. Def.'s FFCL ¶¶ 128-34, 165-69. Both witness were poor historians. Accordingly, the Court gives their testimony little to very limited weight.

The chief problem is the unreliability of memory of underwriting intent over a forty-year interval, particularly where neither witness was the underwriter on the certificates in suit. Mr. Tang acknowledged on cross-examination that he had no specific recollection of negotiating the individual NARe/Ranger Certificates and was reconstructing his understanding from general practice and from documents shown to him in preparation for trial. Trial Tr. 952:20–973:12 (Tang). Mr. Schneeberger's recollection was similarly reconstructive. Trial Tr. 805:11–816:4 (Schneeberger). Neither witness identified contemporaneous notes, files, or correspondence from their own desk reflecting the negotiation of these certificates. The witnesses' descriptions of "how these things were done" at Swiss Re Zurich are descriptions of general practice, not testimony about the specific relevant transaction(s).

The contemporaneous documents also fail to corroborate the witnesses' present-day understanding. The 1982 telexes, EG memos to file, and broker correspondence describe the structure as a solution to Ranger's "non-admitted reinsurance problem" and to provide Ranger a "clear path to Swiss Re." Def. Ex. D-5027 (EG-AEGIS Aug. 4, 1982); Def. Ex. D-5033 (EG-

NARe Nov. 20, 1982); Def. Ex. D-5019 (EG Memo Sept. 24, 1980). None of these documents state nor contain sufficient language to reasonably infer that the certificates were intended to reinsure only credit risk or to limit NARe's obligation below the face amount. Where decades-old recollection conflicts with the contemporaneous record, the Court follows and relies on the record.

Finally, the witnesses' testimony, taken at face value, does not establish SRA's proposed limitation on the certificates' scope. Mr. Schneeberger and Mr. Tang testified about the economics and purpose of the structure. NARe paid only a fronting commission, NARe retroceded to EG, and the structure was designed to solve a regulatory problem. Def. Ex. D-5002 (Schneeberger Decl. ¶¶ 30–39); Def. Ex. D-5004 (Tang Aff. ¶¶ 22–32). Those propositions are consistent with the documentary record and the Court accepts them. They do not establish that the certificates' plain and unambiguous language, reinsuring "the COMPANY's policy" and "its insurance liability assumed under the policy," should be read more narrowly as suggested by the defendants. Def. Exs. D-5007–D-5012.

## CONCLUSIONS OF LAW

### I. Breach of Contract Standard

To prevail on a breach of contract claim under New York law, a plaintiff must establish (i) the existence of an agreement; (ii) adequate performance by the plaintiff; (iii) breach by the defendant; and (iv) damages. *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011); *see* Def.'s FFCL ¶ 116. The Court addresses each element in turn.

### II. Existence of the Contracts

The existence and validity of the six NARe/Ranger Certificates are not disputed. ECF No. 92 ("Pls. 56.1") ¶¶ 1-2; ECF No. 89 ("Def. 56.1") ¶ 9. The certificates are admitted exhibits, and both parties to those contracts, TIG (as Ranger's successor) and SRA (as NARe's successor),

appear before the Court. The contracts are enforceable agreements of reinsurance governed by New York law. Pls.' FFCL ¶ 1; Def.'s FFCL ¶ 147. The first element is satisfied.

## III. AEGIS's Standing as TIG's Assignee

### A. Legal Framework

Under New York law, an assignee stands in the assignor's shoes and may enforce the assignor's rights to the same extent the assignor could. *Cortlandt St. Recovery Corp. v. Hellas Telecomm., S.a.r.l.*, 790 F.3d 411, 418 (2d Cir. 2015); *New York and Presbyterian Hosp. v. Country-Wide Ins. Co.*, 17 N.Y.3d 586, 592 (2011). "[A] non-party to the contract lacks standing to sue for breach absent a valid assignment of that claim." *Rynasko v. New York Univ.*, 63 F.4th 186, 194 (2d Cir. 2023). The two-part inquiry is (i) whether TIG possessed a viable reinsurance claim against SRA at the time of the purported assignment; and (ii) whether the assignment was validly made. Both questions are resolved in Plaintiffs' favor.

### B. TIG's Claim

SRA argues that TIG had no claim to assign because TIG itself paid nothing on the underlying loss. Def.'s FFCL ¶¶ 121–23, 156–58, 169–70. The argument rests on a formalistic reading of the indemnity principle that the record does not support nor bear.

The Ranger-Fronted Policies named Ranger (now TIG) as the insurer of record, Pl. Exs. 7, 8; Def. Exs. D-5014–D-5017, and the August 3, 2021, settlement released Ranger and TIG from liability under those policies. Def. Ex. D-5124. The release of TIG's policy-level liability is the operative event. Under standard reinsurance principles, a cedent's indemnity right against its reinsurer accrues when the cedent's underlying liability is resolved by payment. *Travelers Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London*, 96 N.Y.2d 583, 587 (2001) ("[R]einsurance indemnity does not arise until the reinsured has paid a claim."). SRA seizes on the word "paid" in

*Travelers* to argue that the cedent must have personally tendered the funds. Def.'s FFCL ¶¶ 126-27. That reading does not survive examination of either the case or the structure of fronting arrangements. *Travelers* addressed when an indemnity right *accrues*, that is, the temporal trigger for the cause of action, not the identity of the party that tenders payment. The case does not address fronting arrangements, principal-fronter payment allocations, or assignments. SRA's remaining authorities fare no better. *N. River Ins. Co. v. Ace Am. Reinsurance Co.*, 361 F.3d 134, 142 (2d Cir. 2004), repeats the familiar description of reinsurance as an indemnity contract that does not arise until the reinsured has paid a claim, and *Fid. & Deposit Co. of Maryland v. Pink*, 302 U.S. 224, 228–29 (1937), enforced a proof-of-payment requirement because the standard form before it expressly imposed one, while reaffirming "the general rules concerning liability of reinsurers announced in the *Allemannia* Case." Neither case addresses who must supply the funds where a principal pays on a fronting carrier's behalf under an express allocation agreement. Indeed, payment of the loss by the reinsured is not a condition precedent to indemnity from the reinsurer unless the reinsurance contract clearly and unambiguously makes it one. *See Hicks v. Poe*, 269 U.S. 118, 120-21 (1925); *Allemannia Fire Ins. Co. of Pittsburg v. Fireman's Ins. Co. of Baltimore*, 209 U.S. 326, 332 (1908); *Republic Metalware Co. v. Gen. Reinsurance Corp.*, 281 N.Y.S. 5, 10-11 (App. Div. 4th Dep't 1935). The Certificates contain no such condition; they require only that claims be "settled by the Company." *See, e.g.*, Def. Ex. D-5010 ¶ F.

Here, TIG's liability under the named policies was extinguished by the settlement payment. Duke received $185 million in exchange for a release that ran in TIG's favor as much as in AEGIS'. From Duke's perspective, which is what matters for whether TIG's liability was "paid," TIG's exposure on the named policies was resolved by a payment to Duke. That release was the

consideration TIG received for its participation in the settlement, and it would not have been forthcoming without payment.

The funding mechanism between AEGIS and TIG is best understood as a payment made on TIG's behalf. Under the May 2017 Agreement, AEGIS expressly assumed responsibility for "100% of past and future loss . . . and defense costs payable under the Ranger Policies." Def. Ex. D-5093 ¶ 4. AEGIS's settlement payment was thus made in performance of an allocation agreement between principal (AEGIS) and fronter (TIG). New York law has long recognized that a payment made on behalf of an obligor by an agent, indemnitor, or party acting under a contractual allocation agreement discharges the obligor's liability as fully as a direct payment would. *See* Restatement (Second) of Contracts § 278(1) (1981) ("If an obligee accepts in satisfaction of the obligor's duty a performance offered by a third person, the duty is discharged."). For reinsurance-indemnity purposes, AEGIS's payment is properly attributed to TIG. The reinsured liability was paid; only the source of the funds differs from the textbook case. The certificates indemnify TIG for its "insurance liability assumed under the policy," Def. Exs. D-5007–D-5012, and that liability has been discharged.

The proposition that TIG must itself have funded the settlement to assert a reinsurance claim finds no support in the case law SRA cites. *New York and Presbyterian*, 17 N.Y.3d at 592, and *Bronx Entertainment, LLC v. St. Paul Mercury Ins. Co.*, 265 F.Supp.2d 359, 363 (S.D.N.Y. 2003), establish that an assignee inherits the assignor's rights and no more. Neither case holds that an assignor must have personally funded the underlying loss for its reinsurance rights to be assignable. SRA identifies no authority requiring a fronting carrier to forfeit reinsurance rights merely because the principal funded the settlement. A contrary rule would produce a perverse result. Every fronting carrier whose principal paid a settlement would lose its reinsurance, and

every reinsurer who underwrote a fronting carrier's policy paper would receive a windfall. The reinsurance market does not transact on that premise, and New York law does not impose it. *See* Ostrager & Vyskocil, *Modern Reinsurance Law & Practice* § 1:05[b][1], at 33–34 (3d ed. 2014) (describing the ordinary fronting arrangement, in which the fronting insurer retains little or no risk yet remains liable for the full coverage it writes and is reimbursed by its reinsurer). TIG had a contractual right to reinsurance once its policy liability was resolved.

**C. The Assignment**

The August 10, 2021 letter evidences a written assignment from TIG/Ranger/Riverstone to AEGIS "in consideration of AEGIS's advancement of both the defense costs and settlement amounts under the Ranger Policies." Def. Ex. D-5377. Although TIG did not respond in writing, an assignment under New York law need not take any particular form so long as the assignor's intent is clear. *Leon v. Martinez*, 84 N.Y.2d 83, 88 (1994). The record shows TIG intended to assign the claim. First, TIG joined this action as a co-plaintiff, (*see* Compl.), which is a clear manifestation of intent to enforce or transfer a reinsurance claim. Second, Michael Kuehn, who was at TIG when the assignment letter was sent and remains there, testified that he understood the assignment was effected and that TIG authorized AEGIS to bill and collect from SRA. Trial Tr. 345:20–348:6 (Kuehn). Third, TIG has participated continuously in this litigation for over four years, never repudiating the assignment. The assignment is valid, and AEGIS has standing to pursue TIG's reinsurance claim against SRA.

**IV. The Plain Language of the Certificates**

**A. The Text Is Unambiguous**

The interpretation of a reinsurance contract under New York law begins with the contract's words, and where the language is unambiguous it ends there. *Greenfield v. Philles Records, Inc.*,

98 N.Y.2d 562, 569 (2002). Each NARe/Ranger Certificate states: "NARe does hereby reinsure Ranger . . . with respect to the COMPANY's policy hereinafter described," and "[t]his Certificate is an Agreement of Reinsurance under which the Reinsurer indemnifies the Company with respect to its insurance liability assumed under the policy set forth on the front of this Certificate." Def. Exs. D-5007–D-5012. The certificate identifies the underlying Ranger-Fronted Policy on its face by policy number, named insured, period, and limits. *Id.* Neither party contends that this language is ambiguous on its face, and the Court finds no ambiguity. The certificates unambiguously indemnify TIG for its insurance liability under the named policies up to the stated limits.

**B. SRA's Proposed Limitation**

SRA urges the Court to read the certificates as reinsuring only Ranger's net retained "fronting risk," that is, the credit risk of AEGIS's default, rather than the gross policy liability shown on the face of the certificate. Def.'s FFCL ¶¶ 124–39. The text contains no such limitation. The certificates indemnify TIG for "its insurance liability assumed under the policy," not for "its credit exposure to AEGIS's default," "its net retained fronting risk," or "amounts TIG actually paid." Def. Exs. D-5007–D-5012. Had the parties intended to impose such a limitation, they could have provided clear language to that effect.

Fronting arrangements "contain varied terms." Ostrager & Vyskocil, *Modern Reinsurance Law & Practice* § 1:05[b][1], at 31 (3d ed. 2014). The same treatise describes the ordinary fronting arrangement in terms that mirror these certificates, explaining that the fronting insurer, though it retains little or no risk for its own account, remains liable to its insured for the full coverage it writes, pays claims, and is then reimbursed by its reinsurer. *Id.* at 33–34. NARe and Ranger, both sophisticated commercial parties, did not include any limiting language. Significantly, New York law does not permit the Court to supply that limitation now. *Vermont Teddy Bear Co. v. 538*

*Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004). When sophisticated commercial parties "set down their agreement in a clear, complete document", the Court is obligated to properly enforce the agreement according to its terms. *Carbon Direct Fund II Blocker I LLC v. LanzaTech Glob., Inc.*, 245 A.D.3d 589, 590 (App. Div. 1st Dep't. 2026) (citing *Nomura Home Equity Loan, Inc., Series 2006–FM2 v. Nomura Credit & Capital, Inc.*, 30 N.Y.3d 572, 581 (2017)).

**C. Extrinsic Evidence**

Although the analysis begins and ends with the unambiguous text, the extrinsic evidence reinforces rather than undermines the plain-language reading. *Greenfield*, 98 N.Y.2d at 569. The August 1982 EG-AEGIS telex describes the structure's purpose as giving Ranger "a clear path to Swiss Re." Def. Ex. D-5027. The November 1982 EG-NARe telexes directed NARe to issue certificates for the full policy limits set out on the face of each certificate, without any qualification tying those limits to AEGIS's creditworthiness. Def. Exs. D-5033–D-5035. The phrase "clear path to Swiss Re" is more consistent with access to Swiss Re's financial strength through the NARe/Ranger Certificates than with SRA's narrower credit-risk theory. No contemporaneous document uses the words or terms "credit risk," "fronting risk only," or any equivalent limiting phrase. The structure's economics (NARe receiving a fronting commission and retroceding to EG) reflect how NARe managed its own risk exposure on the back end; they do not define what NARe undertook to Ranger on the front end.

**V. The May 2017 Agreement Did Not Extinguish TIG's Reinsurance Rights**

**A. Paragraph 4**

SRA places significant weight on Paragraph 4 of the May 2017 Agreement, in which AEGIS "represents and acknowledges that it is responsible for 100% of past and future loss . . . and defense costs payable under the Ranger Policies." Def. Ex. D-5093 ¶ 4. SRA argues that this

language confirms AEGIS, not TIG, is the real party in interest under the underlying policies, and that TIG accordingly had no liability to be reinsured. Def.'s FFCL ¶¶ 145–52. SRA's contention is not supported by the Agreement's text when read as a whole. Paragraph 4 allocates financial responsibility between AEGIS and TIG as between themselves. Def. Ex. D-5093 ¶ 4. It says little to nothing about TIG's contractual relationship with SRA under separate agreements.

**B. Paragraph 6**

Paragraph 6 of the same Agreement provides: "Neither TIG nor AEGIS intend for this agreement to compromise or in any way affect TIG's right to reinsurance pursuant to policies/certificates issued by North American Reinsurance Company (now known as Swiss Re)." Def. Ex. D-5093 ¶ 6. Paragraph 6 is an express reservation of TIG's reinsurance rights against SRA. *Id.* It names the specific counterparty, the specific instrument type, and the specific intent not to compromise or affect TIG's rights. *Id.* Interpreting Paragraph 4 to eliminate TIG's reinsurance rights, as suggested by SRA, would render Paragraph 6 meaningless, contrary to New York law. *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007); *Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403 (1984). The only reading that gives effect to all provisions is that Paragraphs 4 and 5 allocate responsibility between AEGIS and TIG, while Paragraph 6 preserves TIG's separate rights against SRA.

**C. Extrinsic Evidence and Third-Party Effect**

Mr. Glover's testimony provides further support. He testified that Paragraph 6 was inserted at TIG's insistence specifically to ensure that the Agreement could not be read to extinguish TIG's rights against SRA, and that he personally told AEGIS's outside counsel Alan Rutkin and AEGIS's in-house counsel Helen Lynch about the NARe certificates before the Agreement was signed. Trial Tr. 365:11–14, 386:22–23 (Glover); Pl. Ex. 4 (Glover Aff. ¶¶ 30–38). Both AEGIS witnesses

confirmed the Agreement remains in force. Trial Tr. 435:1–24 (Lynch); Trial Tr. 96:11–12 (Rutkin). Beyond that, a bilateral agreement between two parties cannot alter the rights of a non-signatory third party under separate contracts. *See EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty."). SRA was not a party to the May 2017 Agreement; it neither signed the Agreement nor had any opportunity to comment on or negotiate its terms. *See* Def. Ex. D-5093.

## VI. The Allocation Was Objectively Reasonable and in Good Faith

### A. Legal Standard

Under New York law, a cedent's post-settlement allocation is entitled to deference if it satisfies a standard of "objective reasonableness." *U.S. Fid. & Guar. Co. v. Am. Re-Ins. Co.*, 20 N.Y.3d 407, 420 (2013). The allocation must be "one that the parties to the settlement of the underlying insurance claims might reasonably have arrived at in arm's length negotiations if the reinsurance did not exist." *Id.* Generally, a cedent's motive is unimportant and all that is required is that he act in good faith. *Id.* The standard does not demand that the cedent's allocation be the only defensible methodology, or even the most accurate one in hindsight. *Id.* It demands only that the allocation fall within the range of outcomes that arm's-length parties to the underlying dispute might reasonably have reached. *Id.* AEGIS's 57% allocation satisfies both prongs.

### B. All-Sums for the 1984 Policies

The assumption that the 1984 Ranger-Fronted Policies would be exhausted on an "all sums" basis directly tracks the North Carolina court's June 2020 decision, which governed the allocation methodology applicable to those policies in the underlying action. Pl. Ex. 23. A cedent that structures its allocation in conformity with the governing court's ruling on the applicable legal standard has strong evidence that the allocation falls within the range of reasonable outcomes. *See*

*Travelers Cas. & Sur. Co. v. Gerling Global Reinsurance Corp. of America*, 419 F.3d 181, 194 (2d Cir. 2005). SRA's contention that the North Carolina court did not definitively establish exhaustion of the 1984 policies does not undermine this conclusion. Def.'s FFCL ¶ 177. AEGIS was making a reasonable projection about how a court applying that ruling would resolve the ultimate loss allocation, not stipulating to a final judicial finding.

**C. Pro Rata for Non-Ranger Policies**

The application of pro rata allocation to non-Ranger policies reflects the standard New York approach to long-tail environmental claims. *See Olin Corp. v. OneBeacon Am. Ins. Co.*, 864 F.3d 130, 138 (2d Cir. 2017); *Keyspan Gas E. Corp. v. Munich Reinsurance Am., Inc.*, 31 N.Y.3d 51, 58 (2018). In a multistate coverage dispute involving policies issued under different governing-law frameworks, a cedent's decision to apply the allocation methodology dictated by each policy's governing law is reasonable. AEGIS applied all-sums where North Carolina law required it and pro rata where New York law applied.

**D. The Jaffe Modeling**

AEGIS retained Judson Jaffe, an experienced reinsurance allocation consultant, to model allocation scenarios across a range of variables. Def. Exs. D-5356, D-5190, D-5116, D-5192, D-5117, D-5194, D-5195. The retention of a qualified expert to develop an allocation methodology is itself evidence of reasonableness. The Jaffe-Rutkin correspondence, which SRA characterizes as evidence of bad faith, reflects ordinary advocacy-oriented scenario modeling, the kind that sophisticated parties undertake in pre-litigation settlement planning. The labeling of scenarios as "most beneficial to AEGIS" and "least beneficial to AEGIS" is conventional shorthand for a range of outcomes, not a confession that AEGIS adopted a methodology it knew to be indefensible or unreasonable. Def. Exs. D-5195.

**E. SRA's Technical Challenges**

SRA's challenges focus on two technical omissions, the absence of contribution offsets and the asymmetric application of present-value discounting. Def.'s FFCL ¶¶ 175–87. Neither allege omissions establish bad faith or objective unreasonableness. As to contribution, AEGIS made a single global settlement payment resolving the claims against the released parties. *Id.* ¶ 98. On this record, modeling hypothetical contribution from absent or released parties would have added speculation rather than precision. As to present-value discounting, the *U.S. Fid. & Guar. Co* standard does not require a cedent to apply every methodological adjustment in the reinsurer's favor. 20 N.Y.3d at 420-21. AEGIS's 57% figure, grounded in the ruling governing the underlying Duke action and a professionally developed model, satisfies the standard.

**VII. SRA's Affirmative Defenses**

**A. Waiver and Estoppel**

SRA's waiver and estoppel defenses are not supported by the record. SRA first reserved its rights in writing on March 27, 2017. Def. Ex. D-5092. It repeated those reservations throughout 2020 and 2021. Def. Exs. D-5105, D-5108, D-5109, D-5110. Waiver requires intentional relinquishment of a known right; estoppel requires detrimental reliance on a representation. *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 184 (1982). Neither element is present here. TIG and AEGIS knew from the first communication that SRA was reserving all rights. Pls.' FFCL ¶ 46; Def.'s FFCL ¶ 165. No plaintiff could have detrimentally relied on a representation of coverage when the counterparty has expressly declined to make one. SRA's own conduct also undercuts any claim of prejudice from delay. It monitored the Duke Litigation for years, exchanged communications with AEGIS under a common-interest agreement, and retained

outside counsel to follow the litigation. *See* Def. Ex. D-5003 (Simon Aff. ¶¶ 41, 49); Trial Tr. 142:5-23 (Rutkin).

**B. Mutual Mistake**

SRA's mutual-mistake defense fails. To reform a contract for mutual mistake, the moving party must establish by clear and convincing evidence that both parties shared the same erroneous belief as to a material fact at the time of contracting, and that their actual agreement differed from what the written instrument reflects. *Genger v. Genger*, 76 F.Supp.3d 488, 501 (S.D.N.Y. 2015), *aff'd*, 663 Fed. App'x 44 (2d Cir. 2016). SRA has not met that standard. It has not identified any specific mistake of fact, nor explained how both parties' beliefs differed from the written text. The forty-year course of performance under which AEGIS handled and paid all claims is consistent with the fronting structure as documented at the time and does not reflect a shared misunderstanding of the certificates' scope. Mr. Schupack testified that the "protocol" of AEGIS paying claims was in place when he joined in 1988, four years after the last certificate was issued, and that no one treated it as unusual. Trial Tr. 1270:18–19 (Schupack). That evidence supports a deliberate operating arrangement, not a shared mistake.

**C. Notice**

SRA's notice defense fails on this record. SRA received actual notice of the Duke Litigation and the potential reinsurance claim from TIG's Christopher LeGros in February 2017, when LeGros identified the NARe/Ranger Certificates by certificate number and described AEGIS's request for claims control. Def. Ex. D-5080; Def. Ex. D-5003 (Simon Aff. ¶¶ 12–13). SRA then conducted its own internal investigation, located the certificates in its microfiche records, met with AEGIS's outside counsel in March 2017, retained its own outside coverage counsel in January 2020, and communicated regularly with AEGIS throughout the litigation. Def.

Exs. D-5044, D-5090, D-5003 (Simon Aff. ¶¶ 30–43). A party that monitors a claim with this level of active engagement for four years cannot show prejudice from any alleged technical defect in notice.

**VIII. DAMAGES**

It is well settled that a nonbreaching party in a breach of contract action is entitled to recover general damages which are the ordinary consequence(s) of the breach. See *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 192 (2008) (citing *Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 319 (1989)). The purpose of damages in a breach of contract action is to give the injured party the benefit of the negotiated bargain and to put the nonbreaching party as near as possible to the position it would have been had the breach not occurred. *See Goodstein Const. Corp. v. City of New York*, 80 N.Y.2d 366, 373 (1992) (citing Restatement [2d] of Contracts § 347). Damages are typically assessed as of the date of the breach, not the date of trial. A contract is deemed breached when the time set for performance has expired. *See Cole v. Macklowe*, 64 A.D.3d 480, 480 (App. Div. 1st Dep't. 2009) (citing *Rachmani Corp. v. 9 E. 96th St. Apt. Corp.*, 211 A.D.2d 262, 265 (App. Div. 1st Dep't. 1995)).

Here, Plaintiffs sent Defendants a reinsurance bill, an invoice, dated October 1, 2021, requesting payment within thirty days, on November 1, 2021. (Compl., Ex. 3.) In its reinsurance bill, Plaintiffs requested payment of $114,272,539.00, representing Defendants' proportionate share, 57% of the Duke Litigation Settlement, and $15,478,138.00 in expenses. (*Id.*) These amounts are yet to be paid and remain outstanding.

**CONCLUSION**

Based on the Court's findings of credibility, facts and conclusions of law, the Court determines that Plaintiffs TIG Insurance Company, as successor by merger to Ranger Insurance, and Associated Electric and Gas Insurance Services Limited have demonstrated by a

preponderance of the evidence, that Defendant Swiss Reinsurance America Corporation, formerly North American Reinsurance Corporation, breached their obligations under the six NARe/Ranger Certificates. Accordingly, Plaintiffs are awarded damages in the amount of $114,272,539.00 and $15,478,138.00 in expenses, as damages recoverable in the Duke Litigation Settlement. Plaintiff is further awarded pre-judgment interest from November 1, 2021, and post-judgment interest.

Plaintiffs are directed to settle Judgment.

Dated: November 12, 2026
White Plains, New York

SO ORDERED:

NELSON S. ROMÁN
United States District Judge